**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 22 2016

JAMES W. McCORMACK, CLERK
By:_____
                              DEP CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### LITTLE ROCK DIVISION

UNITED STATES OF AMERICA,

*ex rel.* ABC,

        Plaintiff,

V.                                                    Case No. 4:16cv918-KGB

DEF,                                                  **Jury Trial Demanded**

                                                      **Filed Under Seal**
                                                      31 U.S.C. § 3730(b)(2)

        Defendant.

---

## COMPLAINT
Claims Pursuant to the False Claims Act, 31 USC sec. 3730

### [FILED IN CAMERA AND UNDER SEAL]

---

This case assigned to District Judge Baker
and to Magistrate Judge Ray

#1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### LITTLE ROCK DIVISION

**UNITED STATES OF AMERICA,**
*ex rel.* **INNOVATIVE SOLUTIONS**
**CONSULTING, LLC,**

        **Plaintiff,**

  **v.**

**BUTCHAIAH GARLAPATI,**

        **Defendant.**

**Case No.**

**Jury Trial Demanded**

**Filed Under Seal**
31 U.S.C. § 3730(b)(2)

## COMPLAINT
### Claims Pursuant to the False Claims Act, 31 USC sec. 3730, et seq.

The United States of America, by and through *qui tam* originating relator Innovative Solutions Consulting, LLC ("Relator" or "Innovative LLC"), hereby brings this action pursuant to the False Claims Act ("FCA"), as amended, 31 U.S.C. § 3729 et seq., by and through his attorney Brian H. Mahany and the Law Firm of Mahany Law, and hereby declares the following to recover all damages, penalties, and other remedies available as established by the FCA which were caused by Defendant's repeated and deliberate submissions of false, fraudulent and intentionally deceptive records, claims, prescriptions, statements and representations, used and caused to be made, used and relied upon by the United States Government and its Medicare program.

As will be set forth with greater specificity below, Defendant Butchaiah Garlapati ("Garlapati") knowingly submitted falsified and fraudulent billings and charges to Medicare and prescriptions to Medicare patients in an effort to be paid for services that were not provided, not

2

medically necessary, or were fraudulently coded in such a manner that increased the amount of payments Garlapati received from Medicare and/or possibly from pill mill kingpins. The Medicare program has used government funds to remit payment to Garlapati based upon his false and fraudulent claim submissions for payment or to pay the drug costs based upon his false and fraudulent prescriptions that would not have been made but for Garlapati's false and fraudulent claims and prescriptions. The claims based herein allege that Garlapati wrote such an extreme number of opioid prescriptions that they could not have been medically necessary. Rather, Garlapati was merely trying to line his own pockets with Medicare dollars and/or possibly pill mill kingpin payments as a result of his alleged patient care.

## THE PARTIES

1.  Plaintiff is the United States of America.

2.  Plaintiff-Relator Innovative Solutions Consulting, LLC ("Innovative LLC") is an Arizona Limited Liability Company. Innovative LLC is in the consulting business.

3.  Defendant Garlapati is an Arkansas licensed physician who specializes in physical medicine and rehabilitation. His personal National Provider Identifier (NPI) is 1326035163. His primary practice address is located at 308 Smokey Lane, North Little Rock, AR 72117.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Plaintiff-Relator establishes subject matter jurisdiction under 31 U.S.C. § 3730(b).

5. This Court has personal jurisdiction over the Defendant and is a proper venue pursuant to 28 U.S.C. § 1391 (b) and 31 U.S.C. § 3732(a). Moreover, the Defendant's principal place of business is in this District.

## FEDERAL FALSE CLAIMS ACT

6. The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

7. The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

8. The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

9. "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

10. Private citizens and entities are allowed to bring actions on the government's behalf. "(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government." 31 U.S.C.A. § 3730(b)(1).

11. Under 31 U.S.C.A. § 3730 (e), there has been no statutory relevant public disclosure of the allegation or transactions in this Complaint with respect to which Plaintiff-Relator Innovative LLC is not an "original source," and all material information relevant to this Complaint was provided to the United States Government prior to filing his Complaint pursuant to 31 U.S.C.A. § 3730(e)(4)(B).

12. An "original source" means an individual who "either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B).

13. Innovative LLC is an original source as is defined in 31 U.S.C. § 3730(e)(4)(B). Innovative LLC has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions.

**MEDICARE**

14. The Medicare program was enacted in 1965 and the Secretary of Health and Human Services regulates the administration of the program through the Centers for Medicare and Medicaid Services ("CMS"). 42 C.F.R. § 422.503(a).

15. The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), which was enacted in December 2003, established the Medicare prescription drug benefit (Part D) program and amended the Part C program to allow most Medicare Advantage plans to offer prescription drug coverage. CMS, *Health Plans – General Information*, https://www.cms.gov/Medicare/Health-Plans/HealthPlansGenInfo/index.html?redirect=/healthplansgeninfo/ (last modified: November 10, 2014.)

16. Medicare Part D began on January 1, 2006, and pays for prescription drug benefits for the elderly and disabled. Part D requires beneficiaries to enroll and pay certain premiums, deductibles, co-payments, and even 100% of drug costs after a certain dollar threshold and up to a maximum dollar amount (the "donut hole"), that then triggers catastrophic coverage. The federal government pays 75% of actual costs between the deductible and the donut hole, and 95% of catastrophic coverage.

17. Under Part D, the government advances funds to the Part D Provider ("PDP") monthly per the PDP's accepted bid. As an express condition of payment under Medicare Part D, for each prescription dispensed to one of its Part D enrollees, the PDP must submit to Medicare certain "prescription drug event data," including the price paid by the PDP. The required data is used in the year-end reconciliation process designed to ensure that the government ultimately only pays for the actual cost of FDA-approved drugs dispensed to enrolled beneficiaries

18. In calendar year 2014, there were approximately 37.2 million people that utilized Medicare Part D and there were 1.4 billion prescription drug events. Total Part D expenditures totaled $78.1 billion. Centers for Medicare and Medicaid Services, CMS Fast Facts, July 2016 Version, p. 5, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMS-Fast-Facts/ (Page last modified: July 14, 2016.)

19. In 2014, original Medicare program payments totaled $350.9 billion. *Id.*

20. Each year in the United States, health care insurers process over five billion claims for payment. For Medicare and other health insurance programs to ensure that these claims are processed in an orderly and consistent manner, standardized coding systems are utilized.

21. The Healthcare Common Procedure Coding System (HCPCS) is one of the coding systems that Medicare uses. It is divided into two principal subsystems, referred to as level I and level II of the HCPCS. Level I of the HCPCS is comprised of CPT (Current Procedural Terminology), which is a numeric coding system maintained by the American Medical Association (AMA). The CPT is a uniform coding system consisting of descriptive terms and identifying codes that are used primarily to identify medical services and procedures furnished by physicians and other health care professionals. These health care professionals use the CPT to identify services and procedures for which they bill public or private health insurance programs. Level I of the HCPCS, the CPT codes, does not include codes needed to separately report medical items or services that are regularly billed by suppliers other than physicians. Level II of the HCPCS is a standardized coding system that is used primarily to identify

products, supplies, and services not included in the CPT codes, such as ambulance services and durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS) when used outside a physician's office. Because Medicare and other insurers cover a variety of services, supplies, and equipment that are not identified by CPT codes, the level II HCPCS codes were established for submitting claims for these items. Level II codes are also referred to as alpha-numeric codes because they consist of a single alphabetical letter followed by 4 numeric digits, while CPT codes are identified using 5 numeric digits. Center for Medicare and Medicaid Services, *HCPCS - General Information*, available at https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/index.html?redirect=/m edhcpcsgeninfo/ (Page last Modified: November 23, 2016.)

22. In order to be paid for services rendered, medical providers, such as Garlapati, submit claims to Medicare that include unique HCPCS codes. Medicare then processes the claims and remits payment to the providers based upon the codes submitted.

23. To participate in the Medicare Program, providers enter into provider agreements with the Secretary of the Health and Human Services. The provider agreement requires the provider to agree to conform to all applicable statutory and regulatory requirements for reimbursement from Medicare, including the provisions of Section 1862 of the Social Security Act and Title 42 of the Code of Federal Regulations. As part of that agreement, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute

and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-8551.

24. Medicare only pays providers for services that are medically necessary. 42 U.S.C.A. § 1395y(a)(1A).

25. When submitting claims to Medicare, the claim submission must include both a diagnostic and procedural code. The International Classification of Diseases, Ninth Revision, Clinical Modification (ICD-9-CM), is used to code diagnostic information on claims and CPT codes are a subset of the HCPCS code system, which are the procedural codes submitted. Effective October 1, 2015, ICD-10 is used for services after that date. ICD-10 Transition information, *available at* https://www.cms.gov/Medicare/Coding/ICD10/index.html?redirect=/ICD10/ (Page last Modified: December 2, 2016.)

26. Use of truthful and accurate diagnosis codes on Part B claims is a condition of Medicare payment for those services. 42 U.S.C.A. § 1395u(p)(1).

27. Among the legal obligations of participating providers is the requirement not to make false statements or misrepresentations of material facts concerning payment requests. *See* 42 U.S.C. § 1320a-7b(a)(1)-(2); 42 C.F.R. §§ 1320a-7b(a)(1)-(2), 413.24(f)(4)(iv).

28. Medicare payment rates for services are based on the following components as demonstrated in the Medicare Physician Fee Schedules: 1) Relative Value Units (RVUs); 2) Conversion Factor (CF); and 3) Geographic Practice Cost Indices (GPCIs).

29. The total RVU is determined based upon three separate RVUs. Three separate RVUs are associated with the calculation of a payment under the Medicare Physician Fee Schedule (Medicare PFS):

   i.   The Work RVU reflects the relative time and intensity associated with furnishing a Medicare PFS service and accounts for approximately 50 percent of the total payment associated with a service;

   ii.   The Practice Expense RVU reflects the costs of maintaining a practice (such as renting office space, buying supplies and equipment, and staff costs); and

   iii.   The Malpractice RVU reflects the costs of malpractice insurance.

30. Should Medicare allow a provider claim for payment, the amount of the payment is determined using the above factors.

### Medicare Claims Submissions

31. Medicare Part B claims are submitted on Form HCFA-1500 or its electronic equivalent, Form 837P. 42 U.S.C.A. § 1395w-4(g)(4)(A)(i); 42 C.F.R. § 424.32(b) and (d). A copy of Form HCFA-1500 is attached hereto as Exhibit A.

32. When submitting claims, providers are certifying that the claims are accurate, complete, and medically necessary. As will be demonstrated below, Garlapati's submitted Medicare charges were not accurate, complete, or medically necessary.

33. Form HCFA-1500 provides "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties." The Certification reads:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

*See* Health Insurance Claim Form HCFA-1500; Exhibit A.

34. Therefore, all Medicare providers certify that the services they bill for are accurate, truthful, were actually provided, and were medically necessary.

**The Payment Data Utilized By Relator**

35. As part of the Obama Administration's efforts to make our healthcare system more transparent, affordable, and accountable, CMS "has prepared a public data set, the Part D Prescriber Public Use File (herein referred to as the "Part D Prescriber PUF"), with information on prescription drug events (PDEs) incurred by Medicare beneficiaries with a Part D prescription drug plan. The Part D Prescriber PUF is organized by National Provider Identifier (NPI) and drug name and contains information on drug utilization (unique beneficiary count, claim count, and day supply for which this drug was dispensed) and total drug costs. The data in the Part D Prescriber PUF cover calendar years 2013 and 2014." CMS, *Medicare Fee-for-Service Provider Utilization & Payment Data Part Prescriber Public Use File: A Methodological Overview*, August 17, 2016, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Downloads/Prescriber_Methods.pdf.

36. CMS has prepared a public data set, the Updated prescriber-level Medicare data, which details information on the prescription drugs that were prescribed by individual physicians and other health care providers and paid for under the Medicare Part D Prescription Drug Program.

37. This dataset describes the specific medications prescribed and statistics on their utilization and costs. It provides data on more than one million distinct health care providers who collectively prescribed $121 billion in prescription drugs under the Part

D program in 2014. CMS, *Updated prescriber-level Medicare data*, https://www.cms.gov/Newsroom/MediaReleaseDatabase/Fact-sheets/-Fact-sheets-items/2016-08-18.html (last visited: December 7, 2016.)

38. The Part D Prescriber PUF is based on beneficiaries enrolled in the Medicare Part D prescription drug program who comprise approximately 70 percent of all Medicare beneficiaries. Approximately two thirds of Part D beneficiaries are enrolled in stand-alone Prescription Drug Plans (PDP) with the remaining one third enrolled in Medicare Advantage Prescription Drug (MAPD) plans. CMS, *Medicare Fee-for-Service Provider Utilization & Payment Data Part Prescriber Public Use File: A Methodological Overview*, p. 3, August 17, 2016, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Downloads/Prescriber_Methods.pdf.

39. Providers with fewer than 11 claims are not included in the data file. *Id.*, p. 4.

40. Beginning in 2014, opioid data was included in the Part D Prescriber PUF. The following opioid information is included in the PUF, beginning with calendar year 2014 data.

*opioid_bene_count* – The total number of unique Medicare Part D beneficiaries with at least one opioid claim. The opioid_bene_count is suppressed when opioid_bene_count is between 1 and 10. A blank indicates the value is suppressed. . . .

*opioid_claim_count* – Total claims of opioid drugs, including refills. The opioid_claim_count is suppressed when opioid_claim_count is between 1 and 10. A blank indicates the value is suppressed. . . .

*opioid_drug_cost* – Aggregate cost paid for opioid drugs. This amount includes ingredient cost, dispensing fee and sales tax. If opioid_claim_count is suppressed this variable is suppressed. A blank indicates the value is suppressed. . . .

> *opioid_day_supply* – The aggregate number of day's supply for opioid drugs. If opioid_claim_count is suppressed this variable is suppressed. A blank indicates the value is suppressed.

*Id.*, pp. 11-12.

41. As part of the Obama Administration's efforts to make our healthcare system more transparent, affordable, and accountable, CMS has prepared a public data set, the Medicare Provider Utilization and Payment Data: Physician and Other Supplier Public Use File (the "Part B Payment Data"), with information on services and procedures provided to Medicare beneficiaries by physicians and other healthcare professionals. The Part B Payment Data contains information on utilization, payment (allowed amount and Medicare payment), and submitted charges organized by National Provider Identifier (NPI), Healthcare Common Procedure Coding System (HCPCS) code, and place of service (POS). The Part B Payment Data is based on information from CMS's National Claims History Standard Analytic Files. The Part B Payment Data covers calendar years 2012 through 2014 and contains 100% final-action physician/supplier Part B non-institutional line items for the Medicare fee-for-service population. Physician and Other Supplier Data CY 2014, *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier2014.html (Page last Modified: May 5, 2016.)

42. Beginning with calendar year 2014, the Part B Payment Data includes Medicare standardized payment amounts that allow for comparisons of the Medicare payment amount across geographic areas. Standardization removes geographic differences in payment rates for individual services, such as those that account for local wages or input prices and makes Medicare payments across geographic areas comparable so that

differences reflect variation in factors such as physicians' practice patterns and beneficiaries' ability and willingness to obtain care. Previous year's data have not been re-published to include standardized Medicare payments amounts.

43. The raw data published by CMS contains more than 8,700 types of unique services (HCPCS Codes) that are delivered in 45 different settings and that are consolidated into two places of service, both facility and non-facility. Thus, there are more than 2.6 billion total services provided by more than 986,000 unique NPIs. Per CMS, the Part B Payment Data contains more than nine million records. CMS, *Physician and Other Supplier Data CY 2014, available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier2014.html (Page last Modified: May 5, 2016.)

44. Relator has undertaken an extensive examination and analysis of both Part B Payment Data and Part D Prescriber PUF that has detected and uncovered Garlapati's excessive opioid prescribing practices, which prescriptions cannot be considered medically necessary. Although the raw Part B Payment Data and Part D Prescriber PUF data from which Relator conducted its research is available to the public, Relator's proprietary calculations and results are not.

45. Relator's complex, multifaceted analysis for detecting and uncovering fraudulent billing and charges has provided holistic and comparative context where none existed in the raw Part B Payment Data and Part D Prescriber PUF data.

46. In the Part B Payment Data and Part D Prescriber PUF data, there are no allegations of fraud nor has there been any public disclosure of fraud in any setting.

47. Relator has developed a proprietary formula and methodology (the "formula") that identifies medical providers that have fraudulently falsified Medicare claims submissions for payment and overprescribed opioids without medical necessity.

48. Relator has discovered that Garlapati is a physician who has prescribed extreme amounts of opioids, which prescriptions cannot possibly be medically necessary.

49. No entity or person could view the raw Part B Payment Data and Part D Prescriber PUF data in a vacuum and realize that Garlapati knowingly submitted falsified and fraudulent billings and charges to Medicare and wrote unnecessary opioid prescriptions. Relator's independent knowledge, ingenuity, and insight have materially added to any public disclosure and Relator has contributed significant information on its own.

50. Relator's formula is a multistep statistical process that analyzes the Part B Payment Data and Part D Prescriber PUF data under a variety of circumstances.

51. After applying its formula to the Part B Payment Data and Part D Prescriber PUF data, Relator's formula outputs numerous sets of data that are not publicly available and that which required Relator's substantial efforts to formulate. The formula has calculated the following non-exhaustive list of results:

    i.    A same specialty peer average which compares Garlapati's Medicare claims submissions and prescriptions to that of the average physical medicine and rehabilitation peers' Medicare claims submissions and prescriptions. In essence, this is an average among similarly situated providers as Garlapati's billings and prescriptions are being compared to

more than 7,500 other physical medicine and rehabilitation physicians' billings and prescriptions.

ii.    Garlapati's national ranking in terms of each drug that he prescribed in relation to all other medical providers' use of the same drug in terms of how many days' supply of that drug he prescribed compared to all other providers.

iii.    Garlapati's usage of 3 HCPCS codes for which he was ranked nationally in the top thirteen billers of each code and a comparison of his claims submissions for these three codes to others who submitted claims for the three codes.

iv.    Garlapati's prescription of 15 drugs, out of which 9 were opioids, for which he was ranked nationally in the top thirty prescribers of each drug and a comparison of his prescriptions for drugs to all other providers who prescribed the same 15 drugs.

v.    For five different opioid drugs, Garlapati was ranked among the top 5 prescribers in the nation based on total day supply.

vi.    A yearly trend summary that shows how Garlapati's Part B services and payments as well as Part D claim counts, day supply, and drug cost have rapidly increased even though his patient population is relatively stable.

vii.    The total number of Work Relative Value Units (WRVU) consumed by Garlapati in comparison to physiatrists (physical medicine and rehabilitation physicians) in the 90th percentile.

**Garlapati's Averages**

52. After Relator applied its proprietary formula/methodology to the Part B Payment Data and Part D Prescriber PUF data, Relator was able to determine that Garlapati was prescribing opioids in amounts that could not be medically necessary.

**A. Garlapati Increased His Medicare Billing Significantly From 2012 Through 2014**

53. In only two years, Garlapati's Medicare claim submissions skyrocketed. In 2012, Garlapati submitted claims for 26,842 services. In 2014, he submitted claims for 54,270 claims, which is essentially a 100% increase. Yet over this same time period, the number of Medicare beneficiaries he treated only increased from 1,760 in 2012 to 1,814 in 2014. This shows that Garlapati was billing almost twice as many services for each Medicare patient he treated.

54. This rapid increase in services was associated with significantly larger number of "Established patient office or other outpatient visit, typically 15 minutes" (code 99213) per patient. The 3.45 visits per patient in 2012 jumped by 33% to 4.60 visits per patient in 2014.

55. While his number of claims rose significantly, so did Garlapati's Medicare payments. In 2012, Garlapati was paid $723,351 from Medicare which increased to $1,534,897 in 2014.

56. The following chart details Garlapati's Part B provided services from 2012 through 2014.

| ALL PART B SERVICES - Garlapati | CY2012 | CY2013 | CY2014 | 2013 vs. 2014 % Growth |
|---|---|---|---|---|
| Number of HCPCS | 80 | 102 | 114 | 12% |
| Number of Services | 26,842 | 27,116 | 54,270 | 100% |
| Number of Medicare Beneficiaries | 1,760 | 1,880 | 1,814 | -4% |
| Total Medicare Payment Amount | 723,351 | 925,285 | 1,534,897 | 66% |
| Payment per Patient | 411 | 492 | 846 | 72% |

57. When comparing Garlapati's Medicare Part B claims to those of the average physiatrist, it becomes clear that Garlapati was billing excessive amounts to Medicare. For examples, Garlapati billed 103 HCPCS codes whereas the average physiatrist billed only 26.

58. Garlapati also managed to treat 1,814 patients compared to the average physiatrist who only treated 314 patients. Garlapati's treatment of his large patient volume was also clearly excessive. He provided an average of 23.2 medical services to each patient compared to the average physiatrist who only provided 6.3 services.

59. Garlapati's total Medicare Part B charges, in 2014, were $3,412,545, which is 8.8 times greater than the average physiatrist.

60. Garlapati was also paid $1,374,464 by Medicare compared to the average physiatrist who received Medicare payments, on average, of $110,960.

| 2014 Medical Services | Patients | Services/Patient | Std. Payment/Service | Std. Payment |
|---|---|---|---|---|
| Garlapati | 1,814 | 23 | $33 | $1,374,464 |
| Average PMR (pain management and rehabilitation) | 314 | 6 | $56 | $110,960 |
| Garlapati - Number of Times Avg. PMR | 5.8 | 3.7 | 0.58 | **12.4** |

61. While steadily increasing his Part B services and claims, Garlapati also wrote significantly more prescriptions, which were payable under Part D, in 2014 than 2013. In fact, the total drug costs for his written prescriptions increased from $1,628,159 to $2,877,749 in only one year while the number of Medicare beneficiaries he wrote prescriptions to barely changed at all.

62. The below chart details Garlapati's Part D Claims Summary for 2013 and 2014.

| PART D Claims - Garlapati | CY2013 | CY2014 | 2013 vs. 2014 % Growth |
|---|---|---|---|
| Beneficiary Count | 1,832 | 1,867 | 2% |
| Total Claim Count | 26,616 | 38,733 | 46% |
| Total Day Supply | 794,508 | 1,159,147 | 46% |
| Total Drug Cost | 1,628,159 | 2,877,749 | 77% |

63. When breaking the data down further, the Relator has further learned that Garlapati wrote significantly more opioid prescriptions from 2013 to 2014, even though again his Medicare beneficiary count remained relatively static.

64. The below chart details Garlapati's opioid prescriptions for 2013 and 2014.

| PART D Opioid Claims - Garlapati | CY2013 | CY2014 | 2013 vs. 2014 % Growth |
|---|---|---|---|
| Opioid Claim Count | 15,683 | 23,474 | 50% |
| Opioid Day Supply | 466,769 | 699,472 | 50% |
| Opioid Drug Cost | 1,081,870 | 2,059,351 | 90% |

65. As the above chart demonstrates, in only year, Garlapati saw Medicare's total opioid drug costs increased 90% from 2013 to 2014 for the opioids that he prescribed, yet his total beneficiary number only rose by 2%. This shows Garlapati began aggressively expanding the number of opioids he was prescribing.

66. Additionally, Garlapati wrote opioid prescriptions for a total day's supply of 699,472 days in 2014 whereas in 2013, he only wrote prescriptions for a total day's supply of 466,769. Thus, he prescribed 50% more opioids even though the number of patients he treated went virtually unchanged.

67. Based upon his beneficiary count of 1,831 in 2014, this means Garlapati prescribed each one of those 1,831 patients, on average, approximately 382 days' supply of

opioids in 2014. The average physiatrist only prescribed, on average, 128 days' worth of opioids per patient.

68. The 699,472 opioid day's supply in 2014 made Garlapati the highest opioid prescriber in the country—a number that was 20% higher than that of the second most prolific prescriber. In other words, Garlapati has put more opioids on the street than any other provider by a wide margin.

**B. Garlapati's Opioid Prescription Volume Compared To Other Physiatrists and All Other Prescribers**

69. In 2014, Garlapati wrote opioid prescriptions for 1,831 Medicare beneficiaries. Garlapati prescribed medications to a total of 1,867 Medicare beneficiaries, which means he prescribed opioids to virtually every single one of his Medicare patients.

70. Garlapati's opioid day supply was 55.4 times that of an average physiatrist's opioid day supply. This extraordinarily higher opioid day supply by Garlapati at 55.4 *times* that of the average physiatrist can be explained as follows: Garlapati wrote opioid prescriptions for more patients (18.6 *times* more), wrote more opioid claims per patient (2.7 *times* more) and each claim covered more days (1.1 *times* more). Garlapati's higher averages compared to an average physiatrist are summarized as follows:

| 2014 OPIOID Claims (PMR Prescribers) | Patients | Claims/Patient | Day Supply/Claim | Opioid Day Supply |
|---|---|---|---|---|
| Garlapati | 1,831 | 13 | 30 | 699,472 |
| Average PMR | 98 | 5 | 27 | 12,631 |
| Garlapati - Number of Times Avg. PMR | 18.6 | 2.7 | 1.1 | **55.4** |

71. Relator then expanded his methodology to compare Garlapati's opioid prescription volume to more than half a million other opioid prescribing providers. The results are that Garlapati's opioid day supply was an astounding 200 times that of an average

opioid-prescribing prescriber's opioid day supply. Garlapati wrote opioid prescriptions for more patients (34 *times* more), wrote more opioid claims per patient (4.3 *times* more) and each claim covered more days (1.4 *times* more) than an average opioid prescriber. The below chart compares Garlapati to all other opioid-prescribing prescribers.

| 2014 OPIOID Claims (ALL Prescribers) | Patients | Claims/Patient | Day Supply/Claim | Opioid Day Supply |
|---|---|---|---|---|
| Garlapati | 1,831 | 13 | 30 | 699,472 |
| Average ALL | 54 | 3 | 22 | 3,483 |
| Garlapati - Number of Times Avg. ALL | 34.0 | 4.3 | 1.4 | 200.8 |

## C. Garlapati's Most Commonly Prescribed Drugs

72. In 2014, Garlapati's top two prescribed drugs by him based on total day supply were opioids and four out of the top five were also opioids.

73. Overall, nine of Garlapati's opioid prescriptions ranked by day's supply placed him in the Top 30 prescribers for each of the nine opioids.

74. Garlapati was the highest prescriber of hydrocodone-acetaminophen in the entire county. Garlapati prescribed this drug to an astounding 53% of his patients in 2014 and there were 7,979 claims submitted for it. The national average number of claims for all prescribers of this drug is only 49 claims, meaning Garlapati wrote prescription/refill claims for hydrocodone-acetaminophen 162 *times* more often than the average prescriber.

75. Garlapati prescribed oxycodone HCL to 26% of his patients and there were 3,956 total claims for the drug based upon his prescription volume. The average prescriber only submitted 20 claims in 2014 for this drug, which means Garlapati prescribed oxycodone HCL 196 *times* more claims than the average prescriber.

76. The following chart details Garlapati's most common prescribed drugs in 2014:

| Drug Name | Opioid | Bene Count | % of Patients | Total Claim Count | Total Day Supply | Nat'l Rank | Total Drug Cost | Number of Prescribers | Nat'l Claims per Prescriber | Garlapati - # of Times Nat'l Avg |
|---|---|---|---|---|---|---|---|---|---|---|
| OXYCODONE HCL | YES | 493 | 26% | 3,956 | 117,627 | 4 | $233,637 | 309,940 | 20 | 196 |
| HYDROCODONE-ACETAMINOPHEN | YES | 994 | 53% | 7,979 | 237,610 | 1 | $230,986 | 677,865 | 49 | 162 |
| MORPHINE SULFATE ER | YES | 450 | 24% | 2,915 | 87,058 | 2 | $184,432 | 161,072 | 20 | 144 |
| TIZANIDINE HCL | | 405 | 22% | 2,603 | 79,050 | 2 | $79,531 | 177,314 | 18 | 144 |
| OXYCODONE-ACETAMINOPHEN | YES | 381 | 20% | 2,810 | 84,133 | 6 | $316,212 | 468,068 | 20 | 142 |
| OXYCONTIN | YES | 176 | 9% | 1,325 | 39,373 | 2 | $488,548 | 140,935 | 14 | 98 |
| MORPHINE SULFATE | YES | 96 | 5% | 690 | 20,525 | 15 | $13,201 | 115,504 | 8 | 86 |
| BACLOFEN | | 233 | 12% | 1,339 | 40,292 | 5 | $18,670 | 207,083 | 16 | 85 |
| HYDROMORPHONE HCL | YES | 85 | 5% | 607 | 18,006 | 24 | $18,392 | 165,031 | 7 | 84 |
| CYCLOBENZAPRINE HCL | | 216 | 12% | 859 | 26,108 | 1 | $12,562 | 331,336 | 11 | 81 |
| GABAPENTIN | | 460 | 25% | 2,907 | 89,313 | 9 | $76,719 | 486,754 | 45 | 64 |
| FENTANYL | YES | 167 | 9% | 1,156 | 34,574 | 12 | $152,036 | 173,813 | 18 | 64 |
| METHOCARBAMOL | | 98 | 5% | 475 | 14,200 | 9 | $7,161 | 137,040 | 8 | 61 |
| MEPERIDINE HCL | YES | 12 | 1% | 52 | 1,442 | 5 | $1,712 | 10,791 | 3 | 17 |
| RELISTOR | | 0 | 0% | 26 | 684 | 14 | $23,392 | 3,665 | 4 | 6 |
| | | | | 29,699 | 889,995 | | $1,857,192 | | | |

## D. Garlapati's Claims Submissions for Three Distinct HCPCS Codes Were Among The Top Thirteen Highest Billers For Each Distinct Code

77. For three HCPCS-POS codes, Garlapati's total number of those code claim submissions ranks his usage in 2014 as being among the top thirteen highest billers for those codes as follows:

| HCPCS-POS | HCPCS DESCRIPTION | Garlapati - # of Services | Nat'l Rank | Garlapati - Standard Paid | # of Other Providers | # of Other Services | Svcs per Other Provider w/o Garlapati | Garlapati - Pct of Other Providers | Garlapati # of Times Other Providers |
|---|---|---|---|---|---|---|---|---|---|
| 95990-O | Refilling and maintenance of implantable spinal or brain drug delivery pump or reservoir | 520 | 2 | $ 36,149 | 386 | 4,481 | 11.6 | 11.6 | 45 |
| 99213-O | Established patient office or other outpatient visit, typically 15 minutes | 7,851 | 8 | $ 407,689 | 481,627 | 90,590,543 | 188.1 | 0.0 | 42 |

| HCPCS-POS | HCPCS DESCRIPTION | Garlapati - # of Services | Nat'l Rank | Garlapati - Standard Paid | # of Other Providers | # of Other Services | Svcs per Other Provider w/o Garlapati | Garlapati - Pct of Other Providers | Garlapati # of Times Other Providers |
|---|---|---|---|---|---|---|---|---|---|
| 96102-O | Psychological testing with interpretation and report by technician per hour | 389 | 13 | $ 19,075 | 613 | 37,587 | 61.3 | 1.0 | 6 |

78. As the above chart demonstrates, Garlapati submitted claims for code 95990-O more than anyone else in the country, only behind John Couch (NPI=1053372201) who has already been charged. Garlapati's high utilization accounted for 11.6% of the entire country's claim submissions for this code.

79. Garlapati also ranked 8th nationally for the number of claims he submitted to Medicare for code 99213-0, which is for an established patient office visit. Upon information and belief, Garlapati was using short office visits to prescribe medically unnecessary opioids.

## E. Garlapati' Total Medical Revenue and Work Relative Value Units Far Exceed Those of Other Physiatrists

80. Relator's formula also has produced results relating to Garlapati's total Work Relative Value Units (WRVU). WRVUs reflect the relative time and intensity associated with furnishing a given service for each HCPCS code and represent a standardized and consistent metric, which is a predominant factor in physician compensation.

81. Relator obtained values from the 2014 National Physician Fee Schedule Relative Value File in order to help complete the analysis. CMS, *Details for title: 2014*, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/PFS-Relative-Value-Files-

Items/RVU14D.html?DLPage=1&DLEntries=10&DLFilter=2014&DLSort=0&DLS

ortDir=descending (last visited: December 7, 2016.)

82. Relator then computed Garlapati's total WRVU by matching the HCPCS codes Garlapati's submitted with the values in the 2014 National Physician Fee Schedule Relative Value File.

83. Relator then also obtained the "Cost Survey: 2014 Report Based on 2013 Data," per FTE Physician for Neurology for all practice types, published by the Medical Group Management Association (MGMA), an industry-leading benchmark provider, representing more than 33,000 administrators and executives in 18,000 healthcare organizations in which 385,000 physicians practice.

84. After obtaining the cost survey, Relator created a comparison that compares Garlapati with his busiest peers (physiatrists) at the 90th percentile as published in the MGMA cost survey. The following table demonstrates the comparison between Garlapati's and the 90th percentile revenue producers and WRVU consuming physiatrists.

|  | Garlapati in 2014 (From Medicare only) | MGMA - Physiatry 90th Percentile - All Payers | Garlapati as a % of 90th Percentile MGMA Peer |
|---|---|---|---|
| Total Medical Revenue | $1,476,963 | $703,003 | 210% |
| WRVU | 10,835 | 8,116 | 134% |

85. After conducting this comparison, it has become clear that Garlapati submitted claims to Medicare that indicate he was allegedly more than twice as productive than the busiest (defined as 90th percentile) physiatrist in the MGMA cost survey. This simply is not possible.

86. The levels of billing described above could not have been performed by Garlapati in 2014 due to the sheer number of services for which he has billed Medicare.

87. These results clearly demonstrate that Garlapati is fraudulently and falsely billing Medicare for services that were not provided or were not medically necessary.

88. Although Garlapati does not receive payments under Part D for the prescriptions he wrote in 2014, Medicare's total cost of his prescribed opioids was $2,059,351, which is 43.8 times higher than the average physiatrist's opioid prescriptions which only cost Medicare $47,027. When comparing Garlapati to all opioid prescribers, his opioid prescriptions cost Medicare 253.5 times more money than did the average opioid prescriber's.

89. Upon information and belief, Garlapati has excessively prescribed medically unnecessary opioid prescriptions. Upon further information and belief, Garlapati was paid money through Medicare Part B claims submissions for treatments he allegedly provided to his patients. However, these treatments were solely performed so that Garlapati could prescribe additional opioids. Thus, the claims themselves are for medically unnecessary treatments and therefore, should not have been paid.

90. It is easy to see that Garlapati's Medicare payments exploded when he began prescribing opioids unnecessarily. In 2013, Garlapati was paid $925,285 by Medicare. In 2014, he was paid $1,534,897. At the same time, Garlapati's drug costs to Medicare nearly doubled.

91. Garlapati's payments from Medicare, which were made to him on the basis that the treatments were reasonable and medically necessary, were fraudulent. Therefore, the payments should not have been made. Garlapati's retention of the excess payments should be considered Medicare overpayments. The Defendant was required to return the overpayments and has failed to do so.

## FIRST CLAIM FOR RELIEF

### Violations of the False Claims Act - 31 U.S.C. § 3729(a)(1)(A) and (B)

92. Relator incorporates by reference each of the preceding paragraphs of this Complaint.

93. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729 et seq., as amended.

94. By virtue of the acts described above, the Defendant knowingly presented or caused to be presented false or fraudulent claims, records or other materials for payment which resulted in countless millions of dollars of payments of false claims by the government to the Defendant. All such false claims and acts are in violation of the FCA in general and specifically in violation of 31 U.S.C. § 3729(a)(1)(A), as amended.

95. By virtue of the acts described above, the Defendant also knowingly made, used or caused to be made or used, false records and statements material to a false or fraudulent claim which resulted in millions of dollars of payments of false claims by the United States Government to the Defendant. All such false claims and acts are in violation of the FCA in general and specifically in violation of 31 U.S.C. § 3729(a)(1)(B), as amended.

96. The acts described above induced the United States Government to pay or approve such false or fraudulent claims.

97. Every such payment by the United States to the Defendant was a product of a false claim and materially false statements made by Defendant.

98. In reliance on these false representations and claims, the United States Government, by and through its intermediaries, paid countless millions of dollars for claims submitted by Defendant that it otherwise would not have paid had the government been aware of

Defendant's knowing violations of the FCA and the various rules and regulations of the Medicare program.

99. By reason of Defendant's acts, the United States has been damaged and continues to be damaged in substantial amounts to be determined at trial.

100.    Pursuant to the FCA, Defendant are liable to the United States for treble damages and a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein submitted prior to November 2, 2015 and a civil penalty of not less than $10,781 and not more than $21,563 for each false or fraudulent claim submitted on or after November 2, 2015.

## SECOND CLAIM FOR RELIEF

### False Claims Act: Reverse False Claims – 31 U.SC. § 3729(a)(1)(G)

101.    Relator incorporates by reference each of the preceding paragraphs of this Complaint.

102.    Defendant knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States.

103.    Defendant knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

104.    Defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States.

105.    By virtue of the said false records, statements, or other acts of concealment, the United States has incurred damages.

## THIRD CLAIM FOR RELIEF

### Violations of 42 U.S.C. § 1320a-7k

106.    Relator incorporates by reference each of the preceding paragraphs of this Complaint.

107.    42 U.S.C. 1320a-7k is known as the Medicare and Medicaid program integrity provisions in the Social Security Act. The statute requires a person who has received an overpayment to report and return the overpayment to the Secretary, the state, an intermediary, a carrier, or a contractor, as appropriate, at the correct address, and to notify the Secretary, state, intermediary, carrier or contractor to whom the overpayment was returned in writing of the reason for the overpayment. It requires that an overpayment be reported and "returned by the later of— (A) the date which is 60 days after the date on which the overpayment was identified; or (B) the date any corresponding cost report is due, if applicable." 42 U.S.C. § 1320a-7k(d)(2). Section 1128J(d)(3) of the Act specifies that "any overpayment retained by a person after the deadline for reporting and returning an overpayment is an obligation (as defined in 31 U.S.C. 3729(b)(3)) . . . for purposes of 31 U.S.C. 3729." 42 U.S.C. § 1320a-7k(d)(3).

108.    Pursuant to 42 U.S.C. § 1320a-7k(4)(B) "the term "overpayment" means any funds that a person receives or retains under subchapter XVIII . . . to which the person, after applicable reconciliation, is not entitled under such subchapter." The Defendant has received funds pursuant to subchapters XVIII.

109.    The Defendant knowingly submitted false and fraudulent claims that allowed him to receive greater reimbursement than he was entitled to. The excess reimbursement amounts are therefore "overpayments" that must have been returned. Pursuant to 42

U.S.C. 1320a-7k, the Defendant's retention of these funds constitute overpayments that he was required to reimburse.

110.    Defendant constitutes a "person" under 42 U.S.C. § 1320a-7k(d)(4)(C).

111.    Defendant have not reimbursed the United States the funds that it was overpaid with.

112.    Defendant's actions therefore create a liability under the False Claims Act. Pursuant to the FCA, the Defendant is liable to the United States for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein submitted prior to November 2, 2015 and a civil penalty of not less than $10,781 and not more than $21,563 for each false or fraudulent claim submitted on or after November 2, 2015, plus three (3) times the amount of damages which the United States has sustained because of Defendant's actions.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, the United States of America, through Innovative LLC, requests the Court for entry of judgment against Defendant and the following relief:

A. That Defendant cease and desist from further violations of the False Claims Act, 31 U.S.C. § 3729 et seq., and the related Medicare program;

B. That the Court enter judgment against the Defendant in an amount equal to three times the amount of damages suffered by the United States because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim or certification submitted prior to November 2, 2015 and a civil penalty of not less than $10,781 and not more than $21,563 for each false or fraudulent claim submitted on or after November 2, 2015;

C. That Innovative LLC be awarded the maximum amount allowed pursuant to section
3730(d) of the False Claims Act;

D. That Innovative LLC be awarded all costs of this action, including attorneys' fees, costs
and expenses pursuant to 31 U.S.C. § 3730(d); and

F. That the United States and Innovative LLC be granted such further relief as the court
deems equitable, just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, a jury trial is demanded.

Respectfully submitted on this 19th day of December, 2016.

**MAHANY LAW AND JONES, GILLASPIA & LOYD LLP**

By: _Brian H. Mahany_

Brian H. Mahany
*pro hac vice* forthcoming
P.O. Box 511328
Milwaukee WI 53203
P: (414) 258-2375
F: (414) 777-0776
brian@mahanylaw.com

*/s/ John Bruster Loyd*
John Bruster Loyd
Member Eastern District of AR
Texas State Bar No. 24009032
4400 Post Oak Pkwy, Suite 2360
Houston, Texas 77027
Telephone: 713.225.9000
Facsimile:  713.225.6126
bruse@jgl-law.com

ATTORNEYS FOR PLAINTIFF-RELATOR

30

PLEASE
DO NOT
STAPLE
IN THIS
AREA

APPROVED OMB-0938-0008

CARRIER

## HEALTH INSURANCE CLAIM FORM

| PICA | | PICA |
|---|---|---|

1. MEDICARE  MEDICAID  CHAMPUS  CHAMPVA  GROUP HEALTH PLAN  FECA BLK LUNG  OTHER
(Medicare #)  (Medicaid #)  (Sponsor's SSN)  (VA File #)  (SSN or ID)  (SSN)  (ID)

1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)

3. PATIENT'S BIRTH DATE   SEX
MM  DD  YY    M   F

4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self  Spouse  Child  Other

7. INSURED'S ADDRESS (No., Street)

CITY   STATE

8. PATIENT STATUS
Single  Married  Other

CITY   STATE

ZIP CODE   TELEPHONE (Include Area Code)
(    )

Employed  Full-Time Student  Part-Time Student

ZIP CODE   TELEPHONE (INCLUDE AREA CODE)
(    )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (CURRENT OR PREVIOUS)
YES   NO

a. INSURED'S DATE OF BIRTH   SEX
MM  DD  YY    M   F

b. OTHER INSURED'S DATE OF BIRTH   SEX
MM  DD  YY   M   F

b. AUTO ACCIDENT?   PLACE (State)
YES   NO

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?
YES   NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES   NO   If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED _____   DATE _____

SIGNED _____

14. DATE OF CURRENT:   ILLNESS (First symptom) OR
MM  DD  YY   INJURY (Accident) OR
PREGNANCY(LMP)

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS.
GIVE FIRST DATE  MM  DD  YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM  MM  DD  YY   TO  MM  DD  YY

17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE

17a. I.D. NUMBER OF REFERRING PHYSICIAN

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM  MM  DD  YY   TO  MM  DD  YY

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB?   $ CHARGES
YES   NO

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)

1. ____.____   3. ____.____

2. ____.____   4. ____.____

22. MEDICAID RESUBMISSION
CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A DATE(S) OF SERVICE | | | | | | B Place of Service | C Type of Service | D PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS    MODIFIER | E DIAGNOSIS CODE | F $ CHARGES | G DAYS OR UNITS | H EPSDT Family Plan | I EMG | J COB | K RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM | DD | YY | To MM | DD | YY | | | | | | | | | | |
| 1 | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | |

25. FEDERAL TAX I.D. NUMBER   SSN  EIN

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT?
(For govt. claims, see back)
YES   NO

28. TOTAL CHARGE   $

29. AMOUNT PAID   $

30. BALANCE DUE   $

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)

33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #

SIGNED _____   DATE _____

PIN# _____   GRP# _____

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)

FORM HCFA-1500 (12-90),  FORM RRB-1500,
FORM OWCP-1500

EXHIBIT
A
tabbies

BECAUSE THIS FORM IS USED BY VARIO... GOVERNMENT AND PRIVATE HEALTH PROGRAM..., SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND CHAMPUS PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary if this is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

## BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

## SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION
### (PRIVACY ACT STATEMENT)

We are authorized by HCFA, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR CHAMPUS CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

## MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Humans Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing date sources, gathering and maintaining data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to HCFA, Office of Financial Management, P.O. Box 26684, Baltimore, MD 21207; and to the Office of Management and Budget, Paperwork Reduction Project (OMB-0938-0008), Washington, D.C. 20503.

JS 44 (Rev. 08/16)

# CIVIL COVER SHEET

*1:16cv918*

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

United States of America ex rel Innovative Solutions Consulting, LLC

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Brian Mahany, 8112 W Bluemound Rd, Suite 101, Wauwatosa, WI 53213
Bruse Loyd, 4400 Post Oak Pkwy, Suite 2360, Houston, TX 77027

## DEFENDANTS

Butchaiah Garlapati

County of Residence of First Listed Defendant   Pulaski
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
       Plaintiff

☐ 2  U.S. Government
       Defendant

☐ 3  Federal Question
       *(U.S. Government Not a Party)*

☐ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                  *and One Box for Defendant)*

|                                              | PTF | DEF |                                                          | PTF | DEF |
|----------------------------------------------|-----|-----|----------------------------------------------------------|-----|-----|
| Citizen of This State                        | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State                     | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country      | ☐ 3 | ☐ 3 | Foreign Nation                                           | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☒ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | **LABOR** | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | | ☐ 710 Fair Labor Standards | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | Act | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | | ☐ 720 Labor/Management | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | | Relations | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | | ☐ 740 Railway Labor Act | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | | ☐ 751 Family and Medical | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | | Leave Act | ☐ 893 Environmental Matters |
| | Medical Malpractice | | | ☐ 790 Other Labor Litigation | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 791 Employee Retirement | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | Income Security Act | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | **FEDERAL TAX SUITS** | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | ☐ 870 Taxes (U.S. Plaintiff | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | or Defendant) | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | State Statutes |
| | Employment | **Other:** | | 26 USC 7609 | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| | Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 465 Other Immigration | | |
| | | ☐ 560 Civil Detainee - | Actions | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     Another District
     *(specify)*

☐ 6 Multidistrict
     Litigation -
     Transfer

☐ 8 Multidistrict
     Litigation -
     Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 USC 3729, et seq.
Brief description of cause:
Fraudulent Medicare Billing

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
   UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE _____

DOCKET NUMBER _____

DATE
12/19/2016

SIGNATURE OF ATTORNEY OF RECORD
*Brian H. Mahany*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# MAHANYLAW

**Tim Granitz**
Associate Attorney

P.O. Box 511328  Milwaukee, WI 53203  |  Office: 414.258.2375  |  Fax: 414.777.0776
tgranitz@mahanylaw.com  |  www.mahanylaw.com

December 19, 2016

Clerk of Courts
US District Court
Eastern District of Arkansas
600 W Capitol Ave, Rm A149
Little Rock, AR 72201

Re: *Complaint for Filing Under Seal - case number unassigned*
    *United States ex rel. ABC v. Butchaiah Garlapati*

Dear Clerk of Courts:

Enclosed please find:

1. 3 copies of the Qui Tam Complaint to be filed in this matter, **under seal in paper form.**
2. **1 copy of the required Civil Cover Sheet**
3. **1 copy of the Rule 7.1 Disclosure Statement**
4. A check made payable to the Clerk of U.S. District Courts in the amount of $400 for filing.
5. A SASE so that a file stamped copy of the Complaint can be returned to our office.

Should you have any questions in relation to this or any other matter, please do not hesitate to contact me directly.

Respectfully,

Tim Granitz
Attorney